605 F.2d 119
 CA 79-3411 WESTMORELAND HOSPITAL ASSOCIATION, a non-profit
corporation, Latrobe Area Hospital, a non-profit
corporation, The Altoona Hospital, a non-profit corporation,
The Hamot Medical Center of Erie, Pennsylvania, a non-profit
corporation, Meadville City Hospital, a non-profit
corporation, Saint Vincent Health Center, a non-profit
corporation, Community Mental Health Center of Beaver
County, a non-profit corporation, South Hills Health System,
a non-profit corporation, and Henry Clay Frick Community
Hospital, a non-profit corporation, Appellants,
v.
BLUE CROSS OF WESTERN PENNSYLVANIA, a non-profit
corporation, Secretary of Health, Education and Welfare.
 No. 78-2491.
 United States Court of Appeals, Third Circuit.
 Argued Aug. 7, 1979.
Decided Sept. 10, 1979.
 
 Raymond G. Hasley (argued), Rose, Schmidt, Dixon, Hasley, Whyte & Hardesty, Pittsburgh, Pa., B. Patrick Costello, Costello & Berk, Greensburg, Pa., H. Reginald Belden, Jr., Stewart, Belden, Herrington & Belden, Greensburg, Pa., for appellants.
 Edward L. Springer (argued), Joseph Friedman, Stephen F. Ban, Springer & Perry, Pittsburgh, Pa., for appellee Blue Cross of Western Pennsylvania.
 Before ALDISERT, VAN DUSEN and WEIS, Circuit Judges.
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 This appeal requires us to decide if there is federal question jurisdiction under 28 U.S.C. § 1331(a)[1] to hear a claim brought by nine community hospitals against Blue Cross of Western Pennsylvania. The hospitals originally filed suit in the Court of Common Pleas of Westmoreland County, Pennsylvania to enjoin Blue Cross from computing reimbursement payments in a certain manner and to recover money damages. Blue Cross removed the action to the district court. The hospitals' motion to remand to the state court was denied and judgment on the merits was entered in favor of Blue Cross. The hospitals have appealed. Determining that proper subject matter jurisdiction exists, we affirm.
 
 
 2
 This case is an outgrowth of two successive cost-reimbursement contracts, entered on July 1, 1966 and July 1, 1973, between the hospitals and Blue Cross. Under the terms of the contracts, Blue Cross agreed to pay for the medical care and treatment provided by the hospitals to Blue Cross subscribers. The agreements provided that the hospitals would charge Blue Cross only their costs attributable to rendering service to subscriber patients, rather than their standard rate. The computation of these costs involved what the district court described as "a complicated formula" that had been developed over several decades.[2] Traditionally, Blue Cross has taken the position that federal grants awarded to hospitals are to be treated as restricted funds, and as such, not included in hospital operating costs, under the theory that only the actual costs incurred by the hospital itself for patient care and service should be factored into the amount borne by Blue Cross. What gave rise to this litigation was the application by Blue Cross of its accounting practice to a number of grants to appellants under the Community Mental Health Centers Act. 42 U.S.C. § 2688 to § 2688v (current version at 42 U.S.C. § 2689 to § 2689aa).
 
 
 3
 Under the Act, the Department of Health, Education and Welfare (HEW) administers the mental health program under which these hospitals have qualified for federal grants by providing community mental health services. One of the various grants, deemed central to this dispute, is designated as the mental health staffing grant, which is measured by a percentage of the total projected expenses for wages and salaries for professional and technical employees to staff the mental health centers. HEW required that staffing grants not be used to "supplant" amounts which would otherwise be received by the hospitals from insurance companies or other third-party payers. 42 U.S.C. § 2688a(a)(4).[3] At various times since 1966 each of the hospitals has organized a community mental health center to provide the services and facilities authorized by federal law. Federal staffing grants allotted to them, already paid and forecast for the future, amount to approximately $28,000,000.
 
 
 4
 The Blue Cross accounting practice treated the federal grants as restricted funds, and in computing reimbursable costs to the hospitals, excluded the federal staff grants in determining the actual operating costs of the hospital. The hospitals, beginning in 1971 with the South Hills Health System, objected to this practice. South Hills contended that Blue Cross had no right to deduct the federal grants from the hospital's ordinary costs of operation because, in a related program (Medicare), Blue Cross had accepted HEW's designation that certain "start-up" grants were "seed grants" and did not require them to be applied to costs. South Hills wanted similar treatment for the mental health staff grants. As early as 1971, then, member hospitals and Blue Cross had begun a running disagreement over the accounting treatment by Blue Cross of the federal staffing grants.
 
 
 5
 HEW agreed with the hospitals' interpretation of their Blue Cross contracts and contended that the Blue Cross accounting treatment was tantamount to a violation of 42 U.S.C. § 2688a(a)(4) because, in the absence of federal grants, Blue Cross would have included mental health center staff costs as reimbursable operating costs of the hospital. HEW also contended that the Blue Cross contract was unenforceable as against public policy. When Blue Cross rejected the interpretation urged by the hospitals, HEW threatened to cut off the grants to the Hospitals ! Thus, to use the current idiom, the appellant hospitals found themselves between a rock and a hard place they valiantly sought reimbursement from Blue Cross, yet when they failed, HEW threatened to close off grants to them because Blue Cross interpreted the contract differently from the way HEW did. The district court has accurately described the situation:
 
 
 6
 The Secretary was aware of the controversy and, in fact, caused it. He had urged the hospitals to negotiate a change in the practice used by Blue Cross because the more money Blue Cross paid the hospitals, the better chance they would have of surviving without federal money, but Blue Cross wanted to protect its subscribers and its rates. The more Blue Cross had to pay, the higher the rates it would have to charge. Blue Cross said its subscribers would be subsidizing the taxpayers unless it was permitted to treat the federal grants as restricted grants. As was apparent to everyone, Blue Cross spends only its subscribers' money and the Secretary spends only the taxpayers' money. Finally, the Secretary precipitated this litigation when he threatened to cut off the staffing grants. The hospitals were placed in the middle because they could not operate the mental health clinics without the grants.
 
 
 7
 Appendix at 67a.
 
 
 8
 Thus it cannot be said that HEW was a casual bystander to the contract dispute. If the contract formed the basis of the controversy, it was the threatened HEW action that precipitated the present litigation.
 
 
 9
 Faced with these pressures, the hospitals filed suit seeking money damages from Blue Cross for alleged breaches of the contracts and injunctive relief to prevent Blue Cross from deducting the grants from the amount of allowable hospital costs. After removal, HEW was added as an indispensable party under Rule 19 of the Federal Rules of Civil Procedure, whereupon the Secretary counterclaimed against eight of the hospitals to recover for allegedly erroneous grant payments, claiming that the hospitals had breached the provisions of the post-1975 grants. The district court ruled in favor of Blue Cross on the hospitals' claim and in favor of the hospitals on the Secretary's counterclaim. Only the hospitals have appealed.
 
 I.
 
 10
 The essence of the appellants' jurisdiction argument is that the state court action involved only a contract, to be interpreted under the common law of Pennsylvania, and that no federal question appeared in its theory of the case. Blue Cross argues that the federal question appears on the face of the complaint and that interpretation of federal statutes permeates the entire controversy.
 
 
 11
 We start from the premise that for a civil action to arise under 28 U.S.C. § 1331(a), the "right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action" and that "the controversy must be disclosed upon the face of the complaint, unaided by the answer or by the petition for removal." Gully v. First National Bank, 299 U.S. 109, 112-13, 57 S.Ct. 96, 98, 81 L.Ed. 70 (1936). An unwavering series of Supreme Court decisions has emphasized this rule. See e.g., Tennessee v. Union & Planters' Bank, 152 U.S. 454, 14 S.Ct. 654, 38 L.Ed. 511 (1894); Phillips Petroleum Co. v. Texaco Inc., 415 U.S. 125, 94 S.Ct. 1002, 39 L.Ed.2d 209 (1974) (per curiam).
 
 
 12
 Furthermore, federal removal procedure clearly requires that the initial pleading in the state court must set forth the basis for removal. 28 U.S.C. § 1446(b). The Supreme Court has instructed us that the removal procedure reflects a congressional policy of severe abridgement of the right to remove a state action to federal court. In adjuring strict construction of the removal statutes, the Court has cautioned:
 
 
 13
 Not only does the language of the (removal statute, 28 U.S.C. § 1441) evidence the Congressional purpose to restrict the jurisdiction of the federal courts on removal, but the policy of the successive acts of Congress regulating the jurisdiction of federal courts is one calling for the strict construction of such legislation. The power reserved to the states under the Constitution to provide for the determination of controversies in their courts, may be restricted only by the action of Congress in conformity to the Judiciary Articles of the Constitution. "Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which the statute has defined." Healy v. Ratta, 292 U.S. 263, 270, 54 S.Ct. 700, 703, 78 L.Ed. 1248.
 
 
 14
 Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100, 108-09, 61 S.Ct. 868, 872, 85 L.Ed. 1214 (1941) (other citations omitted). See also American Fire & Casualty Co. v. Finn, 341 U.S. 6, 10, 71 S.Ct. 534, 95 L.Ed. 702 (1951).
 
 
 15
 There is much force to appellants' contention that their claim for relief involved only the interpretation of the Blue Cross contract under Pennsylvania law. Certainly, this was the theory on which the law suit was ultimately decided. But our inquiry as to the presence of federal jurisdiction is not on the basis of how a complaint Could have been structured or of what theory was eventually relied upon at trial. As in La Chemise Lacoste v. Alligator Co., 506 F.2d 339, 343 (3d Cir. 1974), we perceive our task to require an examination of "the face of the complaint" for a federal question. Generally speaking, the nature of plaintiffs' claim must be evaluated, and the propriety of remand decided, on the basis of the record as it stands At the time the petition for removal is filed. Pullman Co. v. Jenkins, 305 U.S. 534, 537, 59 S.Ct. 347, 83 L.Ed. 334 (1939).
 
 
 16
 Our examination discloses that, unlike the situation in La Chemise Lacoste, where the federal question was introduced in the defense pleadings, here the plaintiffs' complaint introduced the federal question. Paragraphs 9, 12 and 13 of the complaint made reference to the federal statutes in question; P 14 described the federal grants in detail. Paragraph 15 was an averment of the mandatory sanction of federal law:
 
 
 17
 The federal law and/or regulations having the force and effect of law pertaining to seed money grants requires grantees such as plaintiff(s) to exert their/its best efforts to secure additional financing from sources other than the federal government, including insurance companies such as Blue Cross, to insure that the mental health care program will continue as a viable service after exhaustion of the seed money grants.
 
 
 18
 Appendix at 10a.
 
 
 19
 Notwithstanding their contention that it would have been possible to decide the contract dispute solely on state law precepts, we see that appellants gratuitously volunteered on the face of their complaint legal conclusions based on federal statutes and regulations. Although these allegations may have been unnecessary for the ultimate disposition of the case, and here we are accepting the appellants' premise, surplusage of federal claims in pleadings is not the test. A subsequent amendment to the complaint after removal designed to eliminate the federal claim will not defeat federal jurisdiction. Hazel Bishop, Inc. v. Perfemme, Inc., 314 F.2d 399 (2d Cir. 1963). "The nature of the relief available after jurisdiction attaches is, of course, different from the question whether there is jurisdiction to adjudicate the controversy." Avco Corp. v. Aero Lodge No. 735, 390 U.S. 557, 561, 88 S.Ct. 1235, 1237-1238, 20 L.Ed.2d 126 (1968). We cannot say that as drafted and filed in the state court, the complaint did not require construction of a federal statute for its disposition. See Lindy v. Lynn, 501 F.2d 1367, 1369 (3d Cir. 1974).
 
 
 20
 This in itself would have been sufficient to vest federal jurisdiction, but appellants made additional averments in their complaint that militate against the contentions they now urge on appeal. In P 35, they averred that
 
 
 21
 the federal government, through HEW, has given notice to plaintiff(s) that they/it is/are and will be in violation of the conditions attached to the grants and ineligible for allotted staffing grant monies or terminated from the grant program until Blue Cross conforms with the condition that it give proper recognition to the seed money grants and not receive any benefit from the grant and, further, that applicable law requires restitution by the plaintiff(s) to HEW of those staffing grant amounts already paid unless Blue Cross makes proper restitution to said plaintiff(s). The date set for the discontinuance of funding is January 1, 1977. Letters from HEW setting forth that position are attached hereto as Exhibits "A", "B" and "C" and intended to become part hereof.
 
 
 22
 Appendix at 14a. Paragraph 35 heightens the federal overtones of this litigation and makes applicable what we said in Lindy v. Lynn : "An action arises under the laws of the United States . . . if it requires the construction of a federal statute or a distinctive policy of a federal statute requires the application of federal legal principles for its disposition." 501 F.2d at 1369.
 
 
 23
 Thus, notwithstanding the restrictive congressional policy against removal, American Fire & Casualty Co. v. Finn, 341 U.S. 6, 71 S.Ct. 534, 95 L.Ed. 702 (1951), appellants' argument cannot succeed. To accept their contention would require us to evaluate the question of federal jurisdiction at the time of trial in the federal court and to decide that subject matter jurisdiction did not obtain because appellants went to trial on state law theories only. To do so would be to ignore the rule in removal cases that subject matter jurisdiction is to be determined from the face of the complaint and on the basis of the record in the state court, At the time the petition for removal is presented. The hospitals' complaint, so viewed, reveals alternative bases for relief against Blue Cross, namely, that the hospitals were entitled to relief under the contract whether it was interpreted according to state law principles or under the federal mental health statutes. Because appellants' complaint was based in part on federal statutes, and federal agency regulations and interpretations, we conclude that there was jurisdiction under 28 U.S.C. § 1331(a). It is immaterial that at trial appellants relied solely on state law principles to make their case.
 
 II.
 
 24
 On the merits, we have no difficulty affirming the judgment of the district court essentially for the reasons set forth in its opinion, Appendix at 64a-88a. The trial court determined, and we agree, that a restricted grant had been recognized by both Blue Cross and the hospitals as a grant to be used for a specific purpose and that the parties had followed
 
 
 25
 the practice, usage and custom of having costs determined by annual audits in which restricted grants were deducted in figuring allowable costs. They did this knowingly and intentionally. The contracts thus encompassed the custom employed. In fact, the custom was to allow Blue Cross to establish the accounting practices and to administer them and to determine what grants were to be excluded in figuring reimbursable costs in some 100 hospitals which served some 2,500,000 Blue Cross subscribers. The determination of allowable costs did not include restricted grants. Restricted grants were grants made for a specific purpose.
 
 
 26
 Appendix at 72a-73a.
 
 The district court also determined
 
 27
 that for purposes of the administration of the contracts between Blue Cross and the hospitals, the federal grants were restricted grants because they were to be used strictly for purposes of paying staff salaries. Under the Blue Cross contracts, both the 1966 and the 1973 contracts and other contracts dating back to the early 50's, the hospitals had given Blue Cross the privilege of establishing the accounting procedure to be used.
 
 
 28
 Appendix at 74a.
 
 
 29
 In a thoughtful analysis of HEW's contention that the Blue Cross contract was void as against public policy, Judge McCune concluded:
 
 
 30
 We find that the Secretary, until this litigation, has never had a policy on this issue and has never contended that deduction of the grants is opposed to the law or public policy. Nor has he held hearings to establish a policy pursuant to his official regulations.
 
 
 31
 We refuse to find the Blue Cross contracts illegal or opposed to public policy. None of the Amendments in plain language made the practice, which was part of the contracts, illegal or opposed to public policy.
 
 
 32
 Appendix at 78a. Apparently HEW has acquiesced in the court's rejection of its contention and denial of its counterclaim. An appeal previously lodged by HEW was withdrawn prior to briefing.
 
 
 33
 The judgment of the district court will be affirmed.
 
 
 
 [1]
 28 U.S.C. § 1331(a) provides:
 The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States except that no such sum or value shall be required in any such action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.
 
 
 [2]
 Appendix at 65a
 
 
 [3]
 42 U.S.C. § 2688a(a) (1975), provided:
 Grants under this part with respect to any community mental health center may be made only upon application, and only if
 (4) the Secretary determines that there is satisfactory assurance that (A) the services to be provided will constitute an addition to, or a significant improvement in quality (as determined in accordance with criteria of the Secretary) in, services that would otherwise be provided, and (B) Federal funds made available under this part for any period will be so used as to supplement and, to the extent practical, increase the level of State, local, and other non-Federal funds, including third party health insurance payments, that would in the absence of such Federal funds be made available for the program described in paragraph (2) of this subsection and will in no event supplant such State, local, and other non-Federal funds.